UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------- X
JOHNNY MAJOR,                            :
                                         :
            Plaintiff,                   :     CASE NO.: _____
                                         :
      -against-                          :     COMPLAINT
                                         :
PORTOLA PHARMACEUTICALS, INC.,           :     DEMAND FOR JURY TRIAL
SCOTT GARLAND, HOLLINGS C.               :
RENTON, JEFFREY BIRD, LAURA BREGE,       :
DENNIS FENTON, JOHN H. JOHNSON,          :
TED LOVE, DAVID C. STUMP, and H.         :
WARD WOLFF,                              :
                                         :
            Defendants.                  :
----------------------------------------- X

**COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934**

Plaintiff Johnny Major ("Plaintiff"), on behalf of himself, by and through his attorneys, alleges the following upon information and belief, including the investigation of counsel and a review of publicly available information, except as to those allegations pertaining to himself, which are alleged upon personal knowledge:

**NATURE OF THE ACTION**

1.  This is an action brought by Plaintiff against Portola Pharmaceuticals, Inc. ("Portola" or the "Company"), its Chief Executive Officer, and the Company's board of directors (collectively referred to as the "Board" or the "Individual Defendants" and, together with Portola, the "Defendants") for their violations of Sections 14(d)(4), 14(e), and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78n(d)(4), 78n(e), 78t(a), respectively, and United States Securities and Exchange Commission ("SEC") Rule 14d-9, 17 C.F.R. §240.14d-9(d) ("Rule 14d-9"), and for breaching their fiduciary duty of candor under the laws of Delaware State. Plaintiff's claims arise in connection with the tender offer by Odyssey Merger Sub, Inc., a

Delaware corporation ("Merger Sub") and the wholly-owned subsidiary of Alexion Pharmaceuticals, Inc. ("Alexion").

2. On May 5, 2020, Portola entered into an Agreement and Plan of Merger (the "Merger Agreement"), pursuant to which, Merger Sub will be merged with and into Portola, with Portola surviving as a direct, wholly-owned subsidiary of Alexion (the "Tender Offer" or the "Transaction"). Under the terms of the Merger Agreement, each stockholder of Portola common stock will be entitled to receive $18.00 in cash per share of common stock (the "Offer Price" or "Merger Consideration").

3. On May 27, 2020, in order to convince Portola's public common stockholders to tender their shares, Defendants authorized the filing of a materially incomplete and misleading Schedule 14D-9 Solicitation/Recommendation Statement (the "Recommendation Statement") with the SEC. The Recommendation Statement was incomplete and/or misleading in regard to three categories of material information: (i) the financial projections created by management; (ii) the financial analyses created by Centerview Partners LLC ("Centerview") in support of its fairness opinion; and (iii) whether the Company entered into confidentiality agreements with other potential bidders and whether those agreements contained restrictive 'Don't Ask, Don't Waive' provisions ("DADW").

4. The Tender Offer is initially scheduled to expire at one-minute following 11:59 p.m., Eastern Time, on July 1, 2020 (the "Expiration Time"). It is imperative that the material information which has been omitted from the Recommendation Statement is disclosed to the Company's stockholders prior to the Expiration Time so they can properly determine whether to tender their shares. Therefore, Plaintiff seeks to enjoin Defendants from taking any steps to consummate the Tender Offer unless and until the material information discussed below is

disclosed to Portola's stockholders sufficiently in advance of the Expiration Time or, in the event the Tender Offer is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

5. This Court has jurisdiction over all claims asserted herein pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1331 because the claims asserted herein arise under Sections 14(d)(4), 14(e), and 20(a) of the Exchange Act and Rule 14d-9. This Court also has jurisdiction over the duty of candor claim pursuant to 28 U.S.C. § 1367.

7. Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over each Defendant by this Court permissible under the traditional notions of fair play and substantial justice. "Where a federal statute such as Section 27 of the [Exchange] Act confers nationwide service of process, the question becomes whether the party has sufficient contacts with the United States, not any particular state." *Sec. Inv'r Prot. Corp. v. Vigman*, 764 F.2d 1309, 1315 (9th Cir. 1985). "[S]o long as a defendant has minimum contacts with the United States, Section 27 of the Act confers personal jurisdiction over the defendant in any federal district court." *Id.* at 1316.

8. Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as 28 U.S.C. § 1391, because Defendants are found or are inhabitants or transact business in this District. Indeed, the conduct at issue will have a substantial effect in this District and certain Defendants have or will receive substantial compensation for doing business in this District. Furthermore, Portola's common stock trades on the Nasdaq, which is also headquartered

in this District. *See, e.g., United States v. Svoboda*, 347 F.3d 471, 484 n.13 (2d Cir. 2003) (collecting cases).

## PARTIES

9. Plaintiff is, and has been continuously throughout all times relevant hereto, the holder of Portola common stock.

10. Defendant Portola Pharmaceuticals, Inc. is a Delaware corporation that maintains its principal executive offices at 270 East Grand Avenue, South San Francisco, California, 94090. Portola's common stock is traded on the Nasdaq under the ticker symbol "PTLA."

11. Defendant Scott Garland is, and has been at all relevant times, the Company's Chief Executive Officer and President.

12. Defendant Hollings C. Renton is, and has been at all relevant times, Chairman of the Board.

13. Defendant Jeffrey Bird is, and has been at all relevant times, a director of the Company.

14. Defendant Laura Brege is, has been at all relevant times, a director of the Company.

15. Defendant Dennis Fenton is, and has been at all relevant times, a director of the Company.

16. Defendant John H. Johnson is, and has been at all relevant times, a director of the Company.

17. Defendant Ted Love is, and has been at all relevant times, a director of the Company.

18. Defendant David C. Stump is, and has been at all relevant times, a director of the Company.

19. Defendant H. Ward Wolff is, and has been at all relevant times, a director of the Company.

20. The defendants identified in paragraphs 11 through 19 are collectively referred to herein as the "Board" or the "Individual Defendants," and together with Portola, the "Defendants."

## SUBSTANTIVE ALLEGATIONS

**Background of the Unfair Transaction and Interests of the Individual Defendants**

21. Portola is a biopharmaceutical company, which develops and commercializes novel therapeutics in the areas of thrombosis, and other hematologic disorders and inflammation in Europe and the United States. Its lead product Andexxa, is an antidote for the treatment of rivaroxaban and apixaban under the Ondexxya Brand. The company also offers Bevyxxa (betrixaban), an oral, once-daily Factor Xa inhibitor for the prevention of venous thromboembolism in adult patients for an acute medical illness.

22. Alexion develops and commercializes various therapeutic products. The company offers ULTOMIRIS (ALXN1210/ravulizumab-cwvz), a monoclonal antibody for the treatment of paroxysmal nocturnal hemoglobinuria (PNH), a genetic blood disorder; and Soliris (eculizumab), a monoclonal antibody for the treatment of PNH, atypical hemolytic uremic syndrome (aHUS), and generalized myasthenia gravis. It also provides Strensiq (asfotase alfa), a targeted enzyme replacement therapy for patients with hypophosphatasia; and Kanuma (sebelipase alfa) for the treatment of patients with lysosomal acid lipase deficiency.

23. On May 5, 2020, Portola authorized a press release announcing the Tender Offer, which states in relevant part:

//

//

**Alexion to Acquire Portola**

**BOSTON & SOUTH SAN FRANCISCO, Calif. – MAY 5, 2020** - Alexion Pharmaceuticals, Inc. (NASDAQ:ALXN) and Portola Pharmaceuticals, Inc. (NASDAQ:PTLA) announced today that they have entered into a definitive merger agreement for Alexion to acquire Portola, a commercial-stage biopharmaceutical company focused on life-threatening blood-related disorders. Portola's commercialized medicine, Andexxa® [coagulation factor Xa (recombinant), inactivated-zhzo], marketed as Ondexxya® in Europe, is the first and only approved Factor Xa inhibitor reversal agent, and has demonstrated transformative clinical value by rapidly reversing the anticoagulant effects of Factor Xa inhibitors rivaroxaban and apixaban in severe and uncontrolled bleeding. The acquisition will add near-term diversification to Alexion's commercial portfolio and provides the opportunity to apply the company's demonstrated global commercial excellence to create long-term value for patients and shareholders. The merger agreement has been unanimously approved by the boards of Alexion and Portola.

"The acquisition of Portola represents an important next step in our strategy to diversify beyond C5. Andexxa is a strategic fit with our existing portfolio of transformative medicines and is well-aligned with our demonstrated expertise in hematology, neurology and critical care," said Ludwig Hantson, Ph.D., Chief Executive Officer of Alexion. "We believe Andexxa has the potential to become the global standard of care for patients who experience life-threatening bleeds while taking Factor Xa inhibitors apixaban and rivaroxaban. By leveraging Alexion's strong operational and sales infrastructure and deep relationships in hospital channels, we are well positioned to expand the number of patients helped by Andexxa, while also driving value for shareholders."

"In developing and launching Andexxa, Portola has established a strong foundation for changing the standard of care for patients receiving Factor Xa inhibitors that experience a major, life-threatening bleed. Andexxa rapidly reverses the pharmacologic effect of rivaroxaban and apixaban within two minutes, reducing anti-Factor Xa activity by 92 percent," said Scott Garland, President and Chief Executive Officer of Portola. "Given their enhanced resources, global footprint and proven commercial expertise, we look forward to working with Alexion to maximize the value of Andexxa. With their commitment to commercial excellence, together, we will be able to drive stronger utilization of Andexxa, increase penetration and accelerate adoption in the critical care setting."

**Transaction Details**

Under the terms of the merger agreement, a subsidiary of Alexion will commence a tender offer to acquire all of the outstanding shares of Portola's common stock at a price of $18 per share in cash. The tender offer is subject to customary conditions, including the tender of a majority of the outstanding shares of Portola common

stock, the expiration or termination of the waiting period under the Hart-Scott Rodino Antitrust Improvements Act of 1976 and receipt of certain other regulatory approvals.

Following successful completion of the tender offer, Alexion will acquire all remaining shares not tendered in the offer at the same price of $18 per share through a merger. The transaction is expected to close in the third quarter of 2020.

Alexion will fund the transaction with cash on hand. As part of the acquisition, Alexion will also be acquiring cash currently on Portola's balance sheet, net of debt of approximately $215 million that will become due upon closing. As of December 31, 2019, cash and short-term investments were approximately $430 million. The actual amounts will be determined as of the transaction close.

RBC Capital Markets, LLC served as Alexion's exclusive financial advisor. Centerview Partners served as Portola's exclusive financial advisor. Cooley LLP served as Portola's legal advisor.

24. In order to effectuate the Transaction, the Defendants agreed to certain restrictive and preclusive deal protection devices which impede the Company's ability to obtain a better offer or terminate the agreement. In fact, the Merger Agreement contains an exclusivity clause which prohibits the Individual Defendants from soliciting a better deal for the common stockholders, and delineates the duties of the Individual Defendants to promptly inform Alexion should an alternative proposal be made, such that it hampers the ability of another counterparty to provide a better deal to stockholders. The termination payment under the Merger Agreement all but ensures no better offer will be forthcoming. According to the Merger Agreement, should Portola terminate, it shall have to pay Alexion $51.5 million, and so creates a steep premium for any other interested bidders.

25. Should the Transaction be completed, Defendants stand to be richly compensated and therefore have interests separate and distinct from that of the common stockholders. Collectively, the Individual Defendants stand to gain tens of millions of dollars through various instruments such as golden parachutes, stock options, prorated bonuses, equity awards, as well as continued employment. To add insult to injury, the CEO of the Company will have the unique

7

benefit of having several million dollars of his stock rolled over into the new combined company—a benefit not shared by the common stockholders who will be cashed out at the unfair Offer Price.

26. This Transaction comes in the midst of the COVID-19 pandemic, at a time when stocks throughout the world are artificially deflated due to great uncertainty and radical economic change, here is no different. The average analyst price target for Portola values the Company at $19.57 per share, *exceeding* the Offer Price by $1.57 per share. Indeed, in the weeks prior to the outbreak of the pandemic, the stock was trading above $25 per share. Piggybacking off the uncertainty of pandemic, the Transaction will provide a substantial discount to Alexion and richly reward the Individual Defendants, all at the expense of the common stockholders who will not see the intrinsic value of their shares realized nor be able to partake in the continued growth of the Company. Therefore, it is imperative that stockholders receive the material information (discussed in detail below) that Defendants have omitted from the Registration Statement, which is necessary for stockholders to properly exercise their corporate suffrage rights and in order to cast an informed vote on the Transaction.

**The Recommendation Statement Omits Material Information**

27. On May 27, 2020, Defendants filed the materially incomplete and misleading Recommendation Statement with the SEC. The Individual Defendants were obligated to carefully review the Recommendation Statement before it was filed with the SEC and disseminated to the Company's stockholders to ensure that it did not contain any material misrepresentations or omissions. However, the Recommendation Statement misrepresents or omits material information that is necessary for the Company's stockholders to determine whether to tender their shares.

28. *First*, the Recommendation Statement fails to fully disclose the projections created by management and relied upon by Centerview in creating its fairness opinion. Both the *Initial*

*Long-Term Plan* and *Updated Long-Term Plan* entirely omit the downward adjustments which resulted in the projections being nearly *halved* in later years. This is especially egregious considering the *Initial Long-Term Plan* valued the Company at $21.70 to $28.05 per share, significantly higher than the Offer Price. As a result, it is necessary for shareholders to see the line-item metrics composing *inter alia* unlevered free cash flow projections. This is especially necessary as the disclosed projections do not comply with generally accepted accounting principles ("GAAP"), a standard of financial reporting which provides information as accurately and with as much relevance as possible.

29. When a Recommendation Statement discloses financial projections and valuation information, those projections and valuations must be complete, honest, and accurate. With regard to future events, uncertain figures, and other so-called soft information, a company may choose silence or speech elaborated by the factual basis as then known—but it may not choose half-truths. *See Campbell v. Transgenomic, Inc.*, 916 F.3d 1121 (8th Cir. 2019). It is of the utmost importance therefore, that stockholders are provided with these line-items metrics, or at the very least, acceptable GAAP metrics such as Net Income. Indeed, Courts have found this information to be material; finding the Net Income metric to significantly "alter the 'total mix' of information made available" to shareholders. *Id.* at 1126. Defendants have only made incomplete and misleading disclosures concerning these projections, and have omitted crucial line items, reconciliations, and other information. Thus, Defendants' omission renders the projections disclosed in the Recommendation Statement misleading.

30. ***Second***, the Recommendation Statement omits material information regarding the analyses performed by Centerview in rendering its fairness opinion.

31. With respect to Centerview's *Selected Public Company Analysis*, the

9

Recommendation Statement fails to disclose: (i) Centerview's assumptions for selecting each of the companies observed; (ii) the individual metrics for each company observed; and (iii) Centerview's basis for changing revenue multiples from 2021 to 2022.

32. With respect to Centerview's *Selected Precedent Transactions Analysis*, the Recommendation Statement fails to disclose: (i) Centerview's assumptions for selecting each of the transactions observed; (ii) the inputs for each of the transactions observed; and (iii) Centerview's assumptions for selecting revenue multiples of 4.5x to 6.5x for 2021 and 4.0x to 5.5x for 2022.

33. With respect to Centerview's *Discounted Cash Flow Analysis*, the Recommendation Statement fails to disclose: (i) Centerview's assumptions and basis for selecting a discount rate range of 9.5% to 11.5 %; (ii) Centerview's assumptions for applying a perpetuity decline rate range of (20.0%) to (30.0%); and (iii) a full sensitivity table.

34. With respect to the price targets observed on Page 40, the Recommendation fails to disclose the mean and median price targets, which are *higher* than the Offer Price.

35. Fairness opinions are fundamental to the M&A process and is ultimately what stockholders rely upon in their determination to vote for or against a transaction. Unfortunately, fairness opinions are also vulnerable to manipulation, which is why it is of the utmost important that stockholders have metrics available—such as those omitted here—to determine whether those metrics are reasonable, or whether they were unreasonably selected in order to obtain a finding of fairness. In valuing large transactions such as these, it becomes all the more critical. As one highly respected professor explained in one of the most thorough law review articles regarding the fundamental flaws of fairness opinions, in a financial analysis a banker takes management's forecasts, and then makes several key choices "each of which can significantly affect the final

valuation." Steven M. Davidoff, *Fairness Opinions*, 55 Am. U.L. Rev. 1557, 1576 (2006). Such choices include "the appropriate discount rate, and the terminal value…" *Id.* As Professor Davidoff explains:

> There is substantial leeway to determine each of these, and any change can markedly affect the discounted cash flow value. For example, a change in the discount rate by one percent on a stream of cash flows in the billions of dollars can change the discounted cash flow value by tens if not hundreds of millions of dollars….This issue arises not only with a discounted cash flow analysis, but with each of the other valuation techniques. This dazzling variability makes it difficult to rely, compare, or analyze the valuations underlying a fairness opinion unless full disclosure is made of the various inputs in the valuation process, the weight assigned for each, and the rationale underlying these choices. The substantial discretion and lack of guidelines and standards also makes the process vulnerable to manipulation to arrive at the "right" answer for fairness. This raises a further dilemma in light of the conflicted nature of the investment banks who often provide these opinions.

*Id.* at 1577-78. Therefore, in order for stockholders to determine whether to tender their shares they need access to the above information, and the omission of these metrics makes each financial analysis identified inherently misleading.

36.     ***Third and finally***, the Recommendation Statement states that the Company had been considering and possibly contacting other potential bidders. Yet, critically, the Recommendation Statement omits whether the Company entered into confidentiality agreements, and if so, whether they contained DADW provisions. The failure to plainly disclose the existence of DADW provisions and confidentiality agreements creates the false impression that any of company could have made a superior proposal than Alexion's proposal. If there are confidentiality agreements containing DADW provisions, then those parties could only make a superior proposal by breaching the agreement—since in order to make the superior proposal, they would have to ask for a waiver, either directly or indirectly. Any reasonable shareholder would deem the fact that the most likely potential topping bidders in the marketplace may be precluded from making a superior

offer to significantly alter the total mix of information.

37. This information has been found to be material by both California and Delaware Courts. Indeed, Plaintiff's attorneys have obtained injunctions on this very issue. *See e.g., In re Integrated Silicon Solution, Inc. Stockholder Litigation Consolidated Action*, Case No. 1-15-CV-278812 (injunction granted June 16, 2015 for failure to disclose DADW restrictions). Indeed, Courts have specifically ruled on this issue and held as to their materiality. For example, the Delaware Court of Chancery granted an injunction in *In re Ancestry.com Inc. S'holder Litig.*, Consol. C.A. No. 7988 (Del. Ch. Dec. 17, 2012), and held that stockholders are entitled to know about DADW clauses, that the Court was "not prepared to allow [the proposed merger] to go to a vote without the stockholders being told about [the DADW clauses]." *Id.* at 228. The Court specifically noted that, without this disclosure, the stockholders were operating under a "false impression that any of the folks who signed the standstill could have made a superior proposal. That's not true. They could only make it by breaching the standstill." *Id.*

38. In sum, the omission of the above-referenced information renders the Recommendation Statement materially incomplete and misleading, in contravention of the Exchange Act. Absent disclosure of the foregoing material information prior to the upcoming special meeting of the Company's stockholders, Plaintiff will be unable to make an informed decision regarding whether to tender his shares, and he is thus threatened with irreparable harm, warranting the injunctive relief sought herein.

## COUNT I

**Against All Defendants for Violation of Section 14(e) of the Exchange Act**

39. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

40. Section 14(e) of the Exchange Act provides that it is unlawful "for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading…" 15 U.S.C. §78n(e).

41. Defendants violated § 14(e) of the Exchange Act by issuing the Recommendation Statement in which they made untrue statements of material facts or failed to state all material facts necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, in connection with the Tender Offer. Defendants knew or recklessly disregarded that the Recommendation Statement failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

42. The Recommendation Statement was prepared, reviewed, and/or disseminated by Defendants. It misrepresented and/or omitted material facts, including material information about the consideration offered to stockholders via the Tender Offer and the intrinsic value of the Company.

43. In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading. Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(e). The Individual Defendants were therefore reckless, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Recommendation Statement, but nonetheless failed to obtain and disclose such information to stockholders although they could have done so without extraordinary effort.

44. The omissions and incomplete and misleading statements in the Recommendation Statement are material in that a reasonable stockholder would consider them important in deciding whether to tender their shares. In addition, a reasonable investor would view the information identified above which has been omitted from the Recommendation Statement as altering the "total mix" of information made available to stockholders.

45. Defendants knowingly or with deliberate recklessness omitted the material information identified above from the Recommendation Statement, causing certain statements therein to be materially incomplete and therefore misleading. Indeed, while Defendants undoubtedly had access to and/or reviewed the omitted material information in connection with approving the Tender Offer, they allowed it to be omitted from the Recommendation Statement, rendering certain portions of the Recommendation Statement materially incomplete and therefore misleading.

46. The misrepresentations and omissions in the Recommendation Statement are material to Plaintiff, and Plaintiff will be deprived of his entitlement to make a fully informed decision if such misrepresentations and omissions are not corrected prior to the Expiration Time.

## COUNT II

### Against all Defendants for Violations of Section 14(d)(4) of the Exchange Act and SEC Rule 14d-9, 17 C.F.R. § 240.14d-9

47. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

48. Defendants have caused the Recommendation Statement to be issued with the intention of soliciting stockholder support of the Tender Offer.

49. Section 14(d)(4) of the Exchange Act and SEC Rule 14d-9 promulgated thereunder require full and complete disclosure in connection with tender offers. Specifically, Section

14(d)(4) provides that:

> Any solicitation or recommendation to the holders of such a security to accept or reject a tender offer or request or invitation for tenders shall be made in accordance with such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

50. SEC Rule 14d-9(d), which was adopted to implement Section 14(d)(4) of the Exchange Act, provides that:

> Information required in solicitation or recommendation. Any solicitation or recommendation to holders of a class of securities referred to in section 14(d)(1) of the Act with respect to a tender offer for such securities shall include the name of the person making such solicitation or recommendation and the information required by Items 1 through 8 of Schedule 14D-9 (§ 240.14d-101) or a fair and adequate summary thereof.

51. In accordance with Rule 14d-9, Item 8 of a Schedule 14D-9 requires a Company's directors to:

> Furnish such additional information, if any, as may be necessary to make the required statements, in light of the circumstances under which they are made, not materially misleading.

52. The omission of information from a recommendation statement will violate Section 14(d)(4) and Rule 14d-9(d) if other SEC regulations specifically require disclosure of the omitted information.

53. The Recommendation Statement violates Section 14(d)(4) and Rule 14d-9 because it omits material facts, including those set forth above, which omissions render the Recommendation Statement false and/or misleading. Defendants knowingly or with deliberate recklessness omitted the material information identified above from the Recommendation Statement, causing certain statements therein to be materially incomplete and therefore misleading. Indeed, while Defendants undoubtedly had access to and/or reviewed the omitted material information in connection with approving the Tender Offer, they allowed it to be omitted from the

Recommendation Statement, rendering certain portions of the Recommendation Statement materially incomplete and therefore misleading.

54. The misrepresentations and omissions in the Recommendation Statement are material to Plaintiff, and Plaintiff will be deprived of his entitlement to make a fully informed decision if such misrepresentations and omissions are not corrected prior to the Expiration Time.

## COUNT III

### Against all Defendants for Violations of Section 20(a) of the Exchange Act

55. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

56. The Individual Defendants acted as controlling persons of Stemline within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as officers and/or directors of Stemline, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Recommendation Statement filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

57. Each of the Individual Defendants was provided with or had unlimited access to copies of the Recommendation Statement and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

58. In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had

16

the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same. The Recommendation Statement contains the unanimous recommendation of each of the Individual Defendants to approve the Tender Offer. They were thus directly involved in preparing the Recommendation Statement.

59. In addition, as the Recommendation Statement sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement. The Recommendation Statement purports to describe the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

60. By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

61. As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Sections 14(e) and 14(d)(4) and Rule 14d-9, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

62. Plaintiff has no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT IV

**(Against the Individual Defendants for Breach of Their Fiduciary Duty of Candor/Disclosure)**

63. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

64. By virtue of their role as directors and/or officers of the Company, the Individual Defendants directly owed Plaintiff a fiduciary duty of candor/disclosure, which required them to disclose fully and fairly all material information within their control when they sought shareholder action, and to ensure that the Recommendation Statement did not omit any material information or contain any materially misleading statements.

65. As alleged herein, the Individual Defendants breached their duty of candor/disclosure by approving and/or causing the materially deficient Recommendation Statement to be disseminated to Plaintiff and the Company's other public stockholders.

66. The misrepresentations and omissions in the Recommendation Statement are material, and Plaintiff will be deprived of their right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the Expiration Time. Where a shareholder has been denied one of the most critical rights he or she possesses—the right to a fully informed vote—the harm suffered is an individual and irreparable harm.

67. Plaintiff has no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A. Preliminarily enjoining Defendants and all persons acting in concert with them from proceeding with the Tender Offer or taking any steps to consummate the Tender Offer, unless and until the Company discloses the material information discussed above which has been omitted from the Recommendation Statement;

B. Directing the Defendants to account to Plaintiff for all damages sustained as a result

of their wrongdoing;

      C.      Awarding Plaintiff, the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

      D.      Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: May 29, 2020       **MONTEVERDE & ASSOCIATES PC**

*/s/ Juan E. Monteverde*
Juan E. Monteverde (JM-8169)
The Empire State Building
350 Fifth Avenue, Suite 4405
New York, NY 10118
Tel: (212) 971-1341
Fax: (212) 202-7880
Email: jmonteverde@monteverdelaw.com

*Attorneys for Plaintiff*